IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01186-PAB-KLM

ROSANNE ALFONSO, an individual,

 Plaintiff,

v.

SCC PUEBLO BELMONT OPERATING COMPANY, LLC, a Delaware limited liability
company d/b/a Belmont Lodge Health Care Center,

 Defendant.

_____

**ORDER**
_____

This matter is before the Court on the motion for summary judgment [Docket No.

32] filed by defendant SSC Pueblo Belmont Operating Company, LLC,[1] doing business

as Belmont Lodge Health Care Center ("Belmont").  The motion is fully briefed and ripe

for disposition.  The Court's jurisdiction over this case is premised upon plaintiff's

invocation of federal questions pursuant to 28 U.S.C. § 1331.

---

[1] The Court granted defendant's motion to amend the caption [Docket No. 21] to
read in pertinent part "SCC Pueblo Belmont Operating Company."  Subsequent to this
motion, however, defendant continued to refer to itself as "SSC Pueblo Belmont
Operating Company" in motions and replies.  *See* Defendant's Motion for Summary
Judgment [Docket No. 32]; Reply Memorandum in Support of Defendant's Motion for
Summary Judgment [Docket No. 41]; Defendant's Motion in Limine Regarding the
Exclusion of Age-Based Comments Which Were Not Exhausted [Docket No. 61].
Moreover, the copy of plaintiff's job description submitted by defendant displays the
name SavaSeniorCare in the header.  Docket No. 32-3 at 1.

## I. BACKGROUND

### A. Statement of Facts

The following facts are undisputed unless otherwise noted. Plaintiff Rosanne Alfonso is a Hispanic female who was born in 1953. Plaintiff's Resp. to Def.'s Mot. for Summary Judgment [Docket No. 39] at 5, ¶ 44; Def.'s Reply [Docket No. 40] at 3, n.1. Belmont is a long-term nursing and rehabilitation facility. Docket No. 32 at 1; Docket No. 39 at 1. Plaintiff was hired by defendant's predecessor, Belmont Nursing Home, as a Certified Nursing Assistant ("CNA") in September of 1994. Compl. [Docket No. 1] at 3, ¶ 9; Docket No. 32 at 4, ¶¶ 9-10. Defendant hired plaintiff as a CNA on or around December 1, 2005. Docket No. 32 at 2, ¶ 1; Docket No. 39 at 1. Plaintiff's job description stated that one of her essential duties was to assist residents with personal care, including toileting. Docket No. 32 at 2, ¶¶ 2-3; Docket No. 39 at 1.

Defendant requires all employees to comply with its three categories of Work Rules. Docket No. 32 at 3, ¶ 7; Docket No. 39 at 1. Category III rules are the most serious, and their violation can lead to suspension or termination. *Id.* Work Rule 37 is a Category III rule, which states: "[e]mployees may not physically, verbally, emotionally, or psychologically abuse a resident, visitor, or another employee; neglect resident care duties related to the safety, health, and/or physical comfort of the residents; or engage in a serious violation of a resident's rights." Docket No. 32 at 4, ¶ 8; Docket No. 39 at 1.

While employed with defendant's predecessor, plaintiff was promoted to the position of Unit Manager, for which she received a raise of $1.00 per hour. Docket No. 32 at 4, ¶ 9; Docket No. 39 at 1. Plaintiff received a disciplinary citation on December

2

22, 2006 for leaving one resident on "poopy sheets" and leaving another resident unattended on a bedpan for over one hour.[2]  Docket No. 32-9, at 4; Docket No. 39 at 2, ¶ 10.  The 2006 citation was signed by plaintiff and included a warning that "[e]mployee will be removed from position as CNA Unit Mgr. should employee continue to fail to perform at acceptable standards.  Further written action or termination may occur depending upon severity of infraction."  Docket No. 32-9 at 4.  After this incident, plaintiff requested she be removed from the Unit Manager position.  Docket No. 32-1 at 24, Alfonso dep. 229, ll. 5-20.  Plaintiff did not lose the $1.00-per-hour raise when she left the position of Unit Manager, and she does not allege that this change was discriminatory.  *Id.* at 25, ll. 7-25; *id.* at 28, ll. 19-24.

On June 16, 2008, plaintiff received a performance rating of 2.47 on a scale of 1.00 to 3.00, indicating that her work met all performance expectations.  Docket No. 39 at 5, ¶ 45; Docket No. 40 at 3, n.1.  In 2008, she was the first runner up for the Colorado Health Care Association District V Spotlight of Excellence Award for "C.N.A. of the Year."  Docket No. 39 at 5, ¶ 46; Docket No. 40 at 3, n.1.  The award honored outstanding long-term care givers who had gone beyond the call of duty to provide care for residents.  *Id.*  On or about September 4, 2008, defendant's administrator, Paula

---

[2] Plaintiff does not dispute receiving this citation, but argues that it should have been removed from her personnel file pursuant to defendant's employment policies because she did not receive any citations for over a year before she was terminated. Docket No. 39 at 2, ¶ 10.  However, the Employee Handbook states that citations "remain in effect until you have completed 12 months without a Disciplinary Action Record except those relating to serious allegations such as resident abuse/neglect[, which] remain in effect indefinitely."  Docket No. 32-6 at 24, ¶ 2.  Since this citation concerned resident neglect, there is no basis for plaintiff's assertion that it should have been removed from her file.

Padilla, asked plaintiff to serve on the Resident Care Specialist Leadership Council ("RCS Leadership Council"), a voluntary group that met with the administrator to promote a good working environment; the position did not entail additional compensation.  Docket No. 32 at 5-6, ¶¶ 16-18; Docket No. 39 at 1.

In July 2009, Judy Cook became defendant's Interim Director of Nursing ("DON").  Docket No. 32 at 6, ¶¶ 19-20; Docket No. 39 at 1.  In November 2009, Ms. Cook became the permanent DON, wherein she oversaw all nursing staff employees, including plaintiff.  *Id*.  Plaintiff asserts that, from July 2009 through October 2009, Ms. Cook made numerous derogatory comments to plaintiff based on her age, told plaintiff she was "watching" her, and threatened her with termination.  Docket No. 39 at 5, ¶ 47.  Plaintiff claims that Ms. Cook made derogatory remarks "daily or every day that she saw [plaintiff]."  Docket No. 39-1, Alfonso Decl. at 2, ¶ 11.  Plaintiff identifies at least five specific age-related remarks that Ms. Cook made: (1) stating that plaintiff was the "oldest C.N.A.," (2) stating that she was "as old as the woodworks," (3) asking her when she was going to retire, (4) telling her she was too old for the job, and (5) telling her she was like "an old penny that keeps coming back."  Docket No. 39-1 at 2-3, ¶¶ 12-14, 16-18.  Plaintiff also claims that Ms. Cook made more general threats, such as telling plaintiff that she was watching her or stating that if she were the director of nursing she would fire plaintiff.  Docket No. 39-1 at 2-3, ¶¶ 15, 19.  Plaintiff declares she was "on pins and needles" at work, that she felt "belittled and humiliated by Ms. Cook's remarks" and under constant pressure, and that it became difficult for her to go to work. Docket No. 39-1 at 3, ¶¶ 17, 23-24.  Defendant denies these allegations in their entirety. Docket No. 40 at 4, ¶ 47.

4

In October 2009, defendant introduced a new program in which the building was divided into four "Neighborhoods," with a leader selected to represent each.  Docket No. 32 at 6, ¶¶ 21-22; Docket No. 39 at 1.  Ms. Padilla, Ms. Cook, and the Assistant DON decided it would be best to have all shifts represented in neighborhood leadership and thus selected Kelly Blackwell, who is Caucasian, to lead the Neighborhood in which plaintiff worked.  *Id*.  Plaintiff never expressed any interest in being part of the Neighborhood Program.  Docket No. 32 at 7, ¶ 24; Docket No. 39 at 1.  Defendant also had in place a "TLC/Quality of Life Program," whereby residents were interviewed on a regular basis regarding their overall quality of care.  Docket No. 32 at 7, ¶ 25; Docket No. 39 at 1.  Such inquiries were made on a neutral basis and did not involve questions about particular CNAs.  Docket No. 32 at 7, ¶ 26; Docket No. 39 at 1.

On October 20, 2009, a "total care" resident (i.e. a resident dependent on others to perform all self-care activities) complained that plaintiff refused to assist her with toileting, despite her request for assistance.  Docket No. 32 at 7, ¶ 27.  The resident reported that, after plaintiff left her alone in her chair, she soiled herself.  *Id*.  Plaintiff disputes the facts underlying the resident's complaint,[3] but does not dispute that the resident reported these facts to Belmont's administration.  Docket No. 39 at 3, ¶ 27.

---

[3] Plaintiff asserts that she offered to help, that the resident requested a procedure that plaintiff refused to perform on the grounds that it was unsafe, that the resident then changed her mind and asked to be taken outside to smoke, and that plaintiff left the resident with another CNA  Docket No. 39 at 3, ¶ 27.  However, in order to rule on defendant's motion, the Court need only determine how the facts appeared to defendant at the time of its termination decision, and not what actually occurred.  *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.").

The facts of the incident as alleged by the resident constituted a violation of Work Rule 37, which, if substantiated, could lead to termination.  Docket No. 32 at 8, ¶ 29; Docket No. 39 at 1.  The resident initially complained to another CNA, who cleaned the resident.  Docket No. 32 at 8, ¶ 30; Docket No. 39 at 1.  The CNA then informed a registered nurse on staff about the complaint and that nurse interviewed the resident.  *Id*.  During the interview, the resident was tearful and "needed additional emotional support."  Docket No. 32 at 8, ¶ 31; Docket No. 39 at 1.  The nurse reported the incident to the administration.  Docket No. 32 at 8, ¶ 30; Docket No. 39 at 1.  On October 25, 2009, plaintiff received a disciplinary citation for this incident, indicating a violation of Work Rule 37.  Docket No. 32-9 at 1.

Plaintiff was placed on administrative leave while defendant conducted an investigation.  Docket No. 32 at 8, ¶ 33; Docket No. 39 at 3-4, ¶ 33.  The investigation was conducted by Ms. Cook and two staff members who worked with the TLC/Quality of Life Program.  Docket No. 32 at 9, ¶ 35; Docket No. 39 at 1.  It consisted of interviews with twenty people, including the resident who had complained, other residents, residents' family members, and staff.  *Id*.  Of the twenty interviews, three were conducted by Ms. Cook.  *Id*.  After the interviews were complete, Ms. Cook and Ms. Padilla reviewed the interview records, considered the resident's emotional state during her initial interview, and found that the incident was substantiated.  Docket No. 32 at 9, ¶ 36; Docket No. 39 at 4, ¶ 36.  Ms. Cook and Ms. Padilla decided to terminate plaintiff's employment.  *Id*.  They also reported the incident to the Colorado Department of Public Health and the Environment, the Board of Nursing, the Ombudsman, and the Pueblo Police Department.  Docket No. 32 at 9, ¶ 38; Docket No. 39 at 1.

6

Ms. Padilla did not witness or hear about Ms. Cook treating any employees in a discriminatory or harassing way.  Docket No. 32 at 10, ¶ 43; Docket No. 39 at 1. Belmont did not terminate or lodge complaints regarding all employees who violated Work Rule 37 in 2009.  Docket No. 39 at 6, ¶¶ 54-55; Docket No. 40 at 3, n.1; *Id*. at 4, ¶ 54.[4]  After her termination, plaintiff sent a letter to Ms. Padilla in an effort to get her job back.  Docket No. 32 at 10, ¶ 39; Docket No. 39 at 1.  Plaintiff wrote to Ms. Padilla because she felt that Ms. Padilla "always respected [her] and gave [her] a lot of credibility and knew [her] work performance" and she "wanted to talk to [Ms. Padilla] and ask her why she would allow Judy to do this to [her]."  Docket No. 32-1 at 4, Alfonso dep. 86, ll.1-4.

## B.  Procedural history

On January 29, 2010, plaintiff filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC"), alleging discriminatory harassment, demotion, and discharge on the basis of national origin and age.  Docket No. 32-19.  The CCRD conducted an investigation and issued a No Probable Cause determination with respect to all claims.  Docket No. 32-20 at 1.  On or about February 12, 2011, plaintiff received a Notice of Right to Sue from the EEOC.  Docket No. 1 at 13.  On May 3, 2011, she brought this action under the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act ("Title

---

[4] There were two violations of Work Rule 37 in 2009 that were addressed with a written warning: in one instance, a nurse did not timely respond to a call light and a resident wet the bed; in the other instance, a nurse did not provide a resident with a necessary hygiene procedure.  Docket No. 31-5/32-22 at 5-6.  Ms. Cook was not the decision maker in either case.  *Id*.

VII"), alleging (1) discriminatory discharge on the basis of national origin and age; (2) discriminatory demotion on the basis of national origin and age; and (3) creation of a hostile work environment based upon national origin and age.  Docket No. 1 at 3-7. Defendant now moves for summary judgment on all claims and plaintiff opposes.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex,* 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* FED. R. CIV. P. 56(e).  "To avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson,* 477 U.S. at 248).

## III. DISCUSSION

### A.  Discriminatory Discharge

Plaintiff alleges that she was terminated because of her age and national origin in violation of Title VII and the ADEA. Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1) (2006). A plaintiff may prove discrimination indirectly, using the *McDonnell Douglas* three-part burden-shifting framework. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296

F.3d 1177, 1180 (10th Cir. 2002); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The ADEA prohibits employers from discriminating against any "individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  It protects employees who are forty years of age or older.  *Id*. at 631(a).  The ADEA requires "but-for" causation, meaning that a plaintiff claiming age discrimination must establish by a preponderance of the evidence that, but for her age, her employer would not have taken the adverse action. *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177-78 (2009).  "*Gross* does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action."  *Jones v. Okla. City Pub. Schs.,* 617 F.3d 1273, 1278 (10th Cir. 2010).  Nor does *Gross* "preclude our continued application of *McDonnell Douglas* to ADEA claims." *Id.*  Thus, the Court may analyze plaintiff's Title VII and the ADEA claims together under the *McDonnell Douglas* framework.

At step one of the *McDonnell Douglas* inquiry, a plaintiff must establish a prima facie case by showing that (1) she was a member of a protected class; (2) she was qualified for her job and performing satisfactorily; (3) she was discharged despite her qualifications; and (4) there is some additional evidence giving rise to an inference of discrimination, for example the position was not eliminated.  *Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175

(10th Cir. 2004).  If the plaintiff succeeds in establishing a prima facie case, the burden

shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its

adverse employment action.  *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321

(10th Cir. 2004).  If the defendant produces a legitimate reason, then the court must

grant the defendant summary judgment, unless the plaintiff can show a genuine issue

of material fact as to whether the stated reason for the adverse action is pretextual.  *Id*.

### 1.  Prima Facie Case

A plaintiff has established a prima facie case if the undisputed facts, viewed in

the light most favorable to the plaintiff, would allow a reasonable jury to draw an

inference of discrimination.  *Hysten*, 296 F.3d at 1181.  An inference of discrimination

arises where there is a "logical connection" between each element of the prima facie

case and the alleged discrimination.  *Kendrick*, 220 F.3d at 1227.

Here, it is undisputed that plaintiff falls within a protected class on the basis of

her age (she is over 40) and on the basis of her race (she is Hispanic).  Docket No. 32

at 17.  It is also undisputed that her termination constituted an adverse action.

However, defendant disputes plaintiff's assertions that she was performing satisfactorily

and that she was treated less favorably than other similarly situated employees.  *Id*. at

17-18.

Defendant argues that plaintiff's 2008 performance review is insufficient to

establish that her performance was adequate, especially in light of the 2006 disciplinary

action.  *Id*.  However, that is precisely the purpose of a performance review: to assess

an individual's overall competence in performing her job.  *See, e.g.*, *Avila v. Jostens,*

*Inc.*, 316 F. App'x 826, 833 (10th Cir. 2009) (holding that a plaintiff's annual job evaluation was evidence of his exceptional performance).  Plaintiff's review indicates that, as of April 14, 2008, she was an above-average employee according to the defendant's own standards and evaluation procedures.  Docket No. 39-7, at 3. Plaintiff's 2008 Spotlight on Excellent Award also contributes to a finding that she was qualified for her job.  Docket No. 39-8.

The previous disciplinary action cited by defendant is not sufficient to undermine the conclusion that plaintiff was qualified and performing adequately.  Although the citation included a serious warning, and it was plaintiff's first citation for a violation of that level, defendant decided to retain plaintiff.  *See* Docket No. 32-9.  Further, plaintiff's final disciplinary action, which precipitated her termination, is not sufficient to establish that she was not qualified to perform her job since the facts underlying that action are sharply contested.  Docket No. 39 at 5-7, ¶¶ 48-57.

Moving to the third element of the prima facie case, defendant argues that plaintiff has failed to show that she was treated less favorably than similarly situated employees.  Docket No. 32 at 17-18.  Although the Tenth Circuit does not require plaintiff to make that specific showing, she must nonetheless allege facts sufficient to permit an inference that, more likely that not, her termination was motivated by discrimination.  *See Kendrick*, 220 F.3d at 1227.  Evidence relevant to this inquiry includes: "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . ., preferential treatment given to employees outside the protected class . . . . or, more generally, upon the timing or sequence of

events leading to plaintiff's termination."  *Plotke v. White*, 405 F.3d 1092, 1101 (10th

Cir. 2005).

To satisfy this element, plaintiff may rely on the derogatory age-related remarks

allegedly made by Ms. Cook.  Viewed in the light most favorable to plaintiff, these

remarks "reflect[] a discriminatory animus" on the part of Ms. Cook, one of the two

decision makers in plaintiff's termination.  Docket No. 39 at 5, ¶ 47; *see Hare v. Denver*

*Merch. Mart, Inc.*, 255 F. App'x 298, 303 (10th Cir. 2007) (holding that age-related

remarks made by a decision maker were sufficient to establish a prima facie case of

termination on the basis of age where there was a temporal nexus between the remarks

and the decision to terminate).  Thus, plaintiff satisfies the third element as to her ADEA

claim.

However, as to plaintiff's national origin claim, there are no facts permitting an

inference that defendant's termination decision was motivated by plaintiff's national

origin.[5]  Plaintiff undermines her claim for discrimination on that basis through her

allegations about alleged age discrimination, which appear to contain no suggestion of

discrimination against Hispanics.  For example, plaintiff states that Ms. Cook "did not

---

[5]  The Court recognizes that a plaintiff may assert viable "claims based on the
intersection of different categories of discrimination." *Harris v. Maricopa*, 631 F.3d 963,
976-77 (9th Cir. 2011) ("It is perfectly plausible that gender and race could together give
rise to discrimination in the manner [plaintiff] alleged . . . . Prejudiced individuals have
long promulgated a pernicious image of black men as sexual predators; a view that they
do not hold with respect to men of other racial backgrounds or with respect to black
women.")  However, other than asserting claims "based upon age and national origin,"
plaintiff does not allege any facts or make any arguments suggesting that she is
alleging discrimination based upon the conjunction of these characteristics.  The Court
concludes that plaintiff is asserting two independent claims for discrimination based on
distinct protected traits.

scrutinize the work of young white and young Hispanic workers," Docket No. 1 at 5,

¶ 29, or "make negative comments about the age of young white and young Hispanic"

employees, *id.*, ¶ 30, and that she was treated worse than two other Hispanic

employees, both of whom were disciplined but not terminated for instances of neglect.

Docket No. 39 at 13. Moreover, at her deposition, plaintiff testified that she could not

remember Ms. Cook making any statements related to her national origin. Docket No.

32-1 at 13, Alfonso dep. 171, ll. 12-20. Thus, plaintiff fails to satisfy the third prong as

to her national origin claim.

### 2. *Legitimate Non-Discriminatory Reason*

Defendant has stated a legitimate, non-discriminatory reason for terminating

plaintiff, namely, the alleged incident of neglect in October 2009. Docket No. 32-9 at 1.

Plaintiff does not dispute that, as a Category III violation, neglect of a patient is grounds

for termination under Belmont's policy. Docket No. 32 at 8, ¶ 29; Docket No. 39 at 1.

Thus, summary judgment is appropriate unless plaintiff can show that there is a triable

issue of material fact as to whether defendant's stated reason is pretextual.

### 3. *Pretext*

A plaintiff may show pretext by demonstrating that there are "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's

stated reason such that "a reasonable factfinder could rationally find them unworthy of

credence and hence infer that the employer did not act for the asserted non-

discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)

(quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996) (internal

quotation marks omitted).  The court's role is to prevent and redress employment discrimination, and not to act as a " 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); (quoting *Jones v. Barnhart,* 349 F.3d 1260, 1267 (10th Cir. 2004)); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").

An employer's discriminatory remarks may be circumstantial evidence of discriminatory animus, especially if they are made contemporaneously with a warning or termination.  *Avila v. Jostens, Inc.*, 316 F. App'x 826, 833 (10th Cir. 2009). Furthermore, "[i]nherent [bias] can warp a supervisor's evaluation of an employee." *Sanders v. S.W. Bell Telephone, L.P.*, 544 F.3d 1101, 1119 (10th Cir. 2008).  For example, in *Reeves v. Sanderson Plumbing Products Inc.*, the Court held that negative age-related comments made by an employer to the plaintiff-employee were evidence that age-based animus was a motivating factor in the plaintiff's termination, even though the comments were not made in the direct context of termination.  530 U.S. 133, 151-52 (2000).  The employer's comments included telling the plaintiff he was "too damn old to do [his] job" and that he was "so old [he] must have come over on the Mayflower."  *Id.* (internal quotation marks omitted).

There must, however, be a causal nexus or link between the discriminatory comments and the personnel decision.  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847,

856 (10th Cir. 2000).  "A causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff."  *Rea v. Martin Marietta Corp.*, 29 F.3d 1450 (10th Cir. 1994).  Stray remarks that are remote in time or made by non-decision makers do not support a finding of pretext.  *Watts v. City of Norman*, 270 F.3d 1288, 1297 (10th Cir. 2001).

Here, plaintiff has alleged that Ms. Cook made age-biased remarks directly to her.  Docket No. 39 at 12.  Like the plaintiff in *Reeves*, she alleges she was told that she was too old to perform her job.  *See* 530 U.S. at 151-52.  Further, the alleged remarks were made by one of the two decision makers in her termination.  *See id*. Although there is no allegation of biased remarks made in the direct context of her termination, plaintiff does allege that remarks about her age were made on a continuous basis during the months immediately preceding her termination and that many of them pertained to her ability to perform her job or contained termination threats.  Thus, the content, timing, and identity of the speaker are sufficient to establish a causal nexus between the alleged remarks and the termination decision.  *See Heno*, 208 F.3d at 856.

Defendant argues that the termination decision was made jointly by Ms. Padilla (who was over forty years old) and Ms. Cook, which defendant seems to suggest makes the decision free of animus.  However, joint decisions are not immune from charges of discrimination.  *See Reeves*, 530 U.S. at 152 ("petitioner introduced evidence that [employer who made age-related remarks] was the actual decisionmaker

behind his firing. [He] was married to Sanderson, who made the formal decision to discharge petitioner."); *see also Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) (holding that a decision maker may be liable for acting as the conduit or "cat's paw" of another individual's bias).

The Court finds that there is a genuine issue of material fact as to whether Ms. Cook made the alleged age-related remarks, and, if so, whether defendant's stated reason for terminating plaintiff is pretextual.   Thus, this aspect of defendant's motion for summary judgment is denied.

### B. Discriminatory Demotion

Plaintiff alleges that she was demoted because of her age and national origin in violation of Title VII.   Docket No. 39 at 19-20.   Under Title VII, the term "adverse employment action" extends to those acts that entail a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."   *Hillig v. Rumsfeld*, 381 F.3d 1028, 1035 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)) (internal quotation marks omitted).   The Tenth Circuit considers each action on a case-by-case basis to determine whether it is adverse.   *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1189 (10th Cir. 2002). A plaintiff need not show loss of a specific job in order to prevail on a theory that the action harmed her employment prospects.   *Hillig*, 381 F.3d at 1033.

Actions that have only a de minimis impact on an employee's future opportunities are not adverse under Title VII.   *Id.*; *see also Aquilino v. Univ. of Kan.*, 268 F.3d 930 (10th Cir. 2001) (holding that removal of assistant professor from tenure

committee incident to denial of tenure did not adversely affect future employment opportunities); *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263 (10th Cir. 2004) (holding that reassignments were not adverse because they did not impose a hardship on plaintiff).  Likewise, a "mere inconvenience or an alteration of job responsibilities" does not rise to the level of an adverse action.  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (holding that transferring teacher to a different school with a slightly longer commute but no other material changes was not an adverse action).

Plaintiff alleges that Kelly Blackwell, another CNA who is younger than plaintiff and Caucasian, replaced her as a "lead" CNA and that this displacement constituted an adverse action.  Docket No. 39 at 19.  However, the undisputed facts show that plaintiff was not replaced.  There is no evidence that plaintiff lost her position as a member of the RCS Leadership Council.  Docket No. 32-1 at 31, Alfonso dep. 244, ll. 15-20.  She does not dispute defendant's assertions that Ms. Blackwell was appointed to a new program, separate and apart from the RCS Leadership Council, called the "Neighborhood Program," or that Ms. Blackwell was selected because she worked the night shift and defendant wanted all shifts represented.  Docket No. 32 at 6, ¶¶ 21-22; Docket No. 39 at 1.  There is no evidence that Ms. Blackwell's appointment to the Neighborhood Program in any way impacted plaintiff's role on the RCS Leadership Council.  Further, plaintiff does not allege that she should have been appointed to the Neighborhood Program in Ms. Blackwell's stead.  It is thus undisputed that plaintiff suffered no adverse employment action.

18

### C. Hostile Work Environment

#### 1. Administrative Exhaustion

Defendant argues that plaintiff failed to exhaust her hostile work environment claim because "she did not allege any comments in support of this claim" and the "CCRD did not investigate any comments because Plaintiff admitted that no one at Belmont made any."  Docket No. 40 at 9.  In the Tenth Circuit, "[e]xhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII," *Jones v. Runyon,* 91 F.3d 1398, 1399 (10th Cir.1996) (quoting *Sampson v. Civiletti,* 632 F.2d 860, 862 (10th Cir.1980)).  In federal court, a plaintiff's claim is "generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (quoting *MacKenzie v. City & Cnty. of Denver,* 414 F.3d 1266, 1274 (10th Cir. 2005)).  In order for a claim to fall within the expected scope of administrative investigation, the charge must contain facts concerning the discriminatory actions underlying the claim.  *Id*.  That is, the text of the charge must clearly set forth the basis of the claim.  *Id*.  Courts liberally construe charges filed with the EEOC in determining whether a plaintiff has exhausted her administrative remedies. *Id*.

In the Charge of Discrimination filed with the CCRD,  plaintiff stated that she was "subjected to unlawful harassment," that she was "scrutinized" on her work performance and "continually threatened with termination," and that these factors together "creat[ed] a hostile work environment."  Docket No. 32-19 at 1.  Moreover, this charge was clearly

within the scope of the CCRD's investigation as it addressed the issue directly.  Docket No. 32-20 at 4-5 ("Harassment by a Supervisor Resulting in Tangible Action/National Origin/Ancestry/Age").  That the CCRD found the evidence insufficient to support a claim of harassment does not remove the charge from the scope of its investigation; on the contrary, it confirms that the charge was properly alleged and fully addressed in an administrative procedure.  Thus, plaintiff has exhausted her administrative remedies.

## 2.  Creation of a Hostile Work Environment

Hostile environment claims are cognizable under the ADEA and are analyzed in the same manner as sexual harassment claims.  *Hartley v. Dept. of Agriculture*, No. 10-cv-0323-ZLW-CBS, 2010 WL 5865371, at *5 (D. Colo. Nov. 29, 2010).   To survive summary judgment on a hostile work environment claim, "a plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment," and (2) the harassment stemmed from animus.  *Chavez v. New Mexico*, 397 F.3d 826, 831-32 (10th Cir. 2005) (quoting *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (citation omitted)).  "A few isolated incidents" of enmity or "sporadic" slurs are insufficient to satisfy this burden.  *Id*. at 932 (quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412-13 (10th Cir.1987)).  Instead, there must be a "steady barrage of opprobrious" comments.  *Id.* (citation omitted).  In determining whether conduct is sufficiently severe or pervasive, the Tenth Circuit considers: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's work performance." *Holmes v. Regents of Univ. of Colo.*, 176 F.3d 488, 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The environment must be both subjectively and objectively hostile in order for the plaintiff's claim to survive. *Mackenzie*, 414 F.3d at 1280.

Furthermore, "the record must support both an inference of a hostile work environment and a basis for employer liability." *Faragalla v. Douglas County Sch. Dist.*, 411 F. App'x 140, 154 (10th Cir. 2011). An "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

Ms. Cook supervised the entire nursing staff including plaintiff in her role as DON and she was one of the decision makers in plaintiff's termination. Docket No. 32 at 6, ¶ 20; Docket No. 39 at 1, 4, ¶ 36. Moreover, the alleged harassment culminated in the tangible action of terminating plaintiff. Thus, the undisputed facts reveal a sufficient basis for establishing defendant's vicarious liability.

The next question is whether the alleged age-related harassment was sufficiently severe and pervasive to alter the terms and conditions of plaintiff's employment.[6] Defendant relies on *DeWalt v. Meredith Corporation* to argue that plaintiff's allegations are not sufficiently severe or pervasive to constitute a hostile work environment. Docket

---

[6] As stated above, plaintiff does not allege that any of defendant's employees, including Ms. Cook, made comments regarding her national origin. *See* Docket No. 32-1 at 13, Alfonso dep. 171, ll.12-20. Thus, the Court will consider the claim of a hostile work environment with respect to plaintiff's age alone.

No. 40 at 8-9; *see* 288 F. App'x 484, 495-96 (10th Cir. 2008).  In that case,  the court

held that "several ageist comments made by Meredith management" and "nitpicking"

the work of older employees was not sufficient evidence to survive a motion for

summary judgment.  *Id*.  Plaintiff had overheard management referring to older

employees as "dinosaurs" and the "Old Meredith" and stating that employees had been

moved to the night shift because they were old.  *Id*. at 495.  Likewise, defendant cites

*Chavez v. New Mexico*, which held that "two racially offensive remarks" were insufficient

to survive a motion for summary judgment.  397 F.3d at 832.  In *Chavez*, plaintiffs

alleged that a supervisor accused them of belonging to a "clica," referring to a Hispanic

clique, and called one of their Caucasian friends and co-workers a "spic lover" in their

presence.  *Id*.  The court held that these two comments fell "short of the 'steady

barrage' required for a hostile environment claim."  *Id*.; *see also Mackenzie*, 414 F.3d

1266, 1281 (comments about an employee's "lassitude and hot flashes," as well as her

"senility and being an 'old lady,'" were insufficient to support a hostile work environment

claim where "mutual bantering" took place between plaintiff and defendant).

The pattern of conduct at issue in this case is distinct from *DeWalt*, *Chavez*, and

*Mackenzie*.  Plaintiff alleges that Ms. Cook, one of the decision makers in her

termination, made derogatory age-related comments directly to her on an almost daily

basis.  Docket No. 39-1 at 2, ¶ 11.  Given the frequency and targeted nature of the

alleged remarks, they cannot be classified as "stray" or "sporadic."  *See Chavez*, 397

F.3d at 832.  There is no indication that Ms. Cook was joking or that a playful rapport

existed between the two women.  Docket No. 39-1 at 2, ¶ 13 ("Cook would laugh, but I

felt humiliated."); *compare Mackenzie*, 414 F.3d at 1281 ("Given the kind of mutual bantering that took place here, we cannot conclude the workplace could be considered either objectively or subjectively hostile."). On the contrary, plaintiff claims that she was always "on pins and needles." Docket No. 39-1 at 3, ¶ 23. She also claims that she "felt belittled and humiliated by Cook's remarks," that it "became difficult for [her] to go to work," and that she tried to avoid seeing Ms. Cook but found it hard to do so. Docket No. 39-1 at 3, ¶¶ 17, 24. The alleged comments questioned plaintiff's qualifications for the job and contained threats of adverse action, creating a nexus between the harassment and plaintiff's ultimate termination. Docket No. 39-1 at 2-3, ¶¶ 14-17, 19.

In sum, there is a genuine dispute as to whether the alleged age-related comments, if made, were sufficiently severe and pervasive to create a hostile work environment.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant SSC Pueblo Belmont Operating Company, LLC's Motion for Summary Judgment [Docket No. 32] is **GRANTED** with respect to plaintiff's claims for discriminatory discharge on the basis of national origin; creation of a hostile work environment on the basis of national origin; and discriminatory demotion on the basis of national origin and age. It is further

**ORDERED** that Defendant SSC Pueblo Belmont Operating Company, LLC's Motion for Summary Judgment [Docket No. 32] is **DENIED** with respect to plaintiff's claims for discriminatory discharge and creation of a hostile work environment on the

basis of age.


DATED December 17, 2012.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge